468 A.2d 347

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Glenn O. HALL, Jr.

Misc. (BV) No. 5, Sept. Term, 1983.

Court of Appeals of Maryland.

Dec. 27, 1983.

Melvin Hirshman, Bar Counsel, Annapolis, for petitioner. Daniel F. Sheehan, Rockville, for respondent.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

PER CURIAM.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Glenn O. Hall, Jr., alleging violations of the disciplinary rules of the Code of Professional Responsibility. We referred the matter, pursuant to Maryland Rule BV9 b, to Judge Calvin R. Sanders of the Circuit Court for Montgomery County to

make findings of fact and conclusions of law. After conducting an evidentiary hearing, Judge Sanders filed detailed findings and conclusions as follows:

"Mrs. Ann Marie Berkeley (hereinafter called Berkeley), involved in a domestic dispute with her husband and being dissatisfied with counsel she had retained to represent her, engaged the services of Glenn O. Hall, Jr., Esquire (hereinafter called Hall) in March, 1978. At the commencement of the attorney-client relationship between them, Berkeley was without funds to pay a fee, was indebted to her previous attorney, William Simmons, in the approximate amount of $1800.00, and had discharged him, primarily, due to his belief that she would not be awarded custody of her children. During the course of the litigation the parties had agreed that Mr. Berkeley would pay to Berkeley $45,000.00 in purchase of her interest in the family home jointly owned by them. Thereafter, in March, 1979, Hall received for Berkeley's account the sum of $15,000.00 representing partial payment of said interest. This sum was deposited in Hall's clients' fund account. Prior to receipt of this payment, Berkeley, being unemployed, had applied for and received social service benefits in the form of welfare payments and food stamps.

"Prior to the receipt of this partial payment, Berkeley had supplemented the welfare payments by loans provided by her father (Hopkins) and a neighbor, Mr. Sambataro, the exact amount of said loans being unknown. The sums deposited in Hall's clients' fund account were used in payment of some of Berkeley's bills, Hall's attorney fees and payments from time to time directly to Berkeley upon her request. No payments were made by Hall on the loans by Berkeley's father and Mr. Sambataro, nor was any net balance distributed to Berkeley.

"Desiring to continue the receipt of welfare benefits, Berkeley made application therefor, reporting to the government the absence of any assets owned by her which would disqualify her from receipt of such payments. In order to

accomplish this, it was necessary that her claim be supported by a statement from Hall confirming her financial status. This support was given in the form of a letter dated June 7, 1979, from Hall to the Anne Arundel County Department of Social Services indicating that his client was without funds of her own. This assurance was given, notwithstanding the fact that at the time it was made Berkeley had a credit balance in Hall's clients' fund account of approximately $3400.00. To resolve this apparent conflict, two letters had been prepared by Hall and signed by Hopkins and Sambataro, claiming entitlement to a portion of the funds held by Hall, but authorizing Hall to use said funds for the benefit of Berkeley.

"In December, 1979, the balance of the payment for Berkeley's interest in her residence was received by Hall and deposited for her account, at which time her previous funds were depleted. In February, 1980, Hall suggested to Berkeley that he had a client (Coad), in immediate need of funds, who would like to borrow $10,000.00 for a brief period of time, which sum would be repaid with $1000.00 interest. In response to this suggestion, Berkeley met Hall at a bank in which she had funds on deposit of a value of $19,000.00. According to Hall's ledger sheet, this loan was repaid, with interest of $13.09, on March 5, 1980. The ledger also shows that on March 7, 1980 a second loan was made to Coad in the form of two entries; one for $9000.00 and one for $1000.00. Simultaneously, an entry appears purporting to show the receipt of $1000.00 representing interest on the first loan to Coad. Thus, it appears that Coad paid the interest on the first loan out of the proceeds of the second loan. There is a factual dispute between Hall and Berkeley as to the circumstances of this second loan; Berkeley denying any advance knowledge, claiming she learned of the same after the fact by telephone, while Hall contends that the second loan was made after full disclosure to and with the knowledge and consent of Berkeley. Hall's testimony in this regard was corroborated by that of his secretary, who stated that Berke-

ley was present in the office and had consented to the second loan at the time it was negotiated with Coad.

"In January, 1980, two loans totaling $7500.00 were made by Hall to Dr. Parkinson, another client. Berkeley testified to a knowledge and approval of this loan, after discussion with Hall, based upon his assurance as to Parkinson's reliability and financial ability to repay. This loan has been repaid in full.

"Other matters of interest which relate to issues before the Court involve Berkeley's financial statement submitted in evidence during the divorce trial, which reflects a debt to Sambataro in the amount of $600.00, when in fact the amount owed was $5000.00, and Hall's letter to Simmons dated May 15, 1979, indicating that he possessed no funds belonging to Berkeley out of which he might pay Simmons' fee, although her account at that time was credited with approximately $5000.00. The evidence is clear that Hall received no commissions, finder's fee or other remuneration as a result of these loans to his clients, and that the attorney fees he withdrew from Berkeley's account were earned by him and authorized by Berkeley.

"Berkeley's testimony at trial raised serious questions concerning the reliability to be afforded to her recollection of the events involving her relationship with Hall. She was obviously mistaken when she indicated to the Court that she was not aware of the fact that Simmons was pressing his claim against her to judgment her testimony that she was unaware of the second loan to Coad was contradicted, not only by Hall and Coad, but by Hall's secretary, and the physical evidence which indicated that she was present in Hall's office and received a check from him on the day the loan was negotiated; the financial statement submitted to the Court at her divorce trial was admittedly false; and her denial of access to her account in Hall's hands was obviously false. In addition, the fact that she continued to seek and receive welfare payments at a time when she well knew that

she was not entitled to them suggests a lack of candor which affects the credibility of all her testimony.

"FINDINGS OF FACT

"The Court has considered the testimony at trial, depositions and other exhibits in evidence, based upon which it makes the following findings of fact:

"1.  That, beginning in March, 1978, and continuing until November, 1980, an attorney-client relationship existed between Hall and Berkeley.

"2.  That during the existence of this relationship there came into the hands of Hall certain funds belonging to Berkeley which were properly deposited in a clients' fund account;  that accurate and complete records were maintained by Hall with respect to receipt and disbursement of such funds;  and that Berkeley was provided ready access to such records, although periodic statements were not mailed to her.

"3.  That certain of the funds belonging to Berkeley were loaned out to persons who were clients of Hall;  that prior to the lending of said sums there was discussion between Hall and Berkeley, in each instance;  that all of the loans were made with the full knowledge and consent of Berkeley, and that no promises or guarantees were made by Hall with respect to the repayment of said loans, other than assurances of the good reputation of the borrowers for honesty and reliability.

"4.  That the legal matters undertaken by Hall on behalf of Berkeley, involving domestic relations litigation, were competently handled by him with adequate advance preparation;  and that the fees charged for such services were by agreement between them.

"5.  That Hall did not undertake representation of Berkeley with respect to Simmons' suit against her, but was requested by Berkeley to allow the claim to go to judgment by default if Simmons would not agree to defer payment until conclusion of the divorce action.

"6. That Hall received no fee, benefit or other special advantage in connection with any of the transactions involving the loans to his clients, nor were any of such loans made under circumstances which conflicted with Hall's obligation of loyalty in furtherance of Berkeley's best interest.

"7. That the actions of Hall in preparation of the letters to him, signed by Hopkins and Sambataro (Plaintiff's Exhibit Nos. 2C and 2D), the letter dated May 15, 1979 from Hall to Simmons (Plaintiff's Exhibit No. 2K), and the letter dated June 7, 1979 from Hall to the Anne Arundel County Department of Social Services (Plaintiff's Exhibit No. 2E), although not fraudulent, were misleading in that they suggested to the recipients that Berkeley was destitute and unable to meet her obligations, although at the times they were written Hall had on deposit in his clients' fund account substantial funds belonging to Berkeley.

## "CONCLUSIONS OF LAW

"The Petition for Disciplinary Action filed herein alleges violations by Hall of Disciplinary Rules 1–102, 4–101, 5–101, 5–105, 6–101, 7–101, 7–102 and 9–102. Based on the foregoing factual determinations the Court finds that the evidence fails to support, by clear and convincing evidence, the allegations against Hall, with the exception that this Court finds that Hall violated Disciplinary Rules 7–102(A)(5) and (7) and 7–102(B)(1), in that he counseled and assisted Berkeley in her efforts to obtain public assistance by misleading representations to third parties when her entitlement to such benefits was questionable. These Rules provide as follows:

DR 7–102(A)—In his representation of a client, a lawyer shall not:

(5) Knowingly make a false statement of law or fact.

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

DR 7–102(B)(1)—A lawyer who receives information clearly establishing that:

(1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal.

"It is noted that, notwithstanding the Court's findings, the evidence shows that Hall has been a practicing member of the Maryland Bar for more than 25 years, that his reputation among other members of the Bar is that of a competent, ethical and reliable attorney, and that the actions herein found to be impermissible were taken not for personal gain, but for what he perceived to be in furtherance of his client's interest. Further, by his testimony Hall has acknowledged the exercise of poor judgment in his management of Berkeley's funds and in some of his other efforts on her behalf, and has assured the Court that he would not repeat such acts should similar circumstances arise in the future."

Hall did not except to any of Judge Sanders' findings. Bar Counsel excepted to Judge Sanders' failure to find that Hall's conduct violated DR 1–102(A)(4), (5) and (6), respectively—engaging in conduct involving misrepresentation, conduct prejudicial to the administration of justice and other misconduct adversely reflecting upon Hall's fitness to practice law. Bar Counsel also took exception to the court's failure to find violations of DR 6–101(A)(1) and (2) and DR 7–101(A)(1) and (3), respectively, *i.e.,* handling a legal matter which Hall knew that he was not competent to handle and without preparation adequate in the circumstances; and failing to seek the lawful objectives of his client through permissible means and prejudicing the client during the course of the attorney-client relationship.

Bar Counsel recommended a suspension of sixty days as the appropriate sanction for Hall's misconduct. Hall urges that we impose a sanction no greater than a public reprimand.

After carefully considering the matter, we accept the findings of Judge Sanders and conclude, in the circumstanc-

es, that a thirty-day suspension is the proper sanction. Hall's suspension shall commence thirty days from the date of the filing of the opinion in this case. Prior to termination of the suspension, Hall shall pay all costs of the disciplinary proceedings.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST GLENN O. HALL, JR.